## Carter, Jr., v. Artcraft Photo-Engraving Company (No. 1)

*T. A. Galbally*, for plaintiff.

*E. Hepburn*, for defendant.

Bok, P. J., November 15, 1951.—The sole issue is the "fair value" of defendant company's 48 shares of stock on November 1, 1949. Defenses based on the invalidity of the contract to buy back plaintiff's 11

shares and on the fraudulent inducement of that contract have been withdrawn.

A basic book value of $61,036.35 for the business is agreed upon. Plaintiff's attack centers upon two classes of items, which he contends were improperly withdrawn from the value of his shares. One consists of two checks totaling $6,984.20 drawn against a building fund, the other consists of unvouched expense charges of various kinds.

No fraud has been alleged or shown against defendant. The bookkeeping was perhaps more figurative than literal in spots, as is apt to happen in small corporations run by friends or close associates, so that only Mr. De Ancona's judgment is in question. That, like judicial discretion, deserves considerable leeway.

The business appears to be an uncertain one in the matter of earnings. For seven years it lost money: for the next six, including two abnormally good ones, it made money. The company has considerable competition and is of a kind that appears vulnerable to new inventions and processes. Largely a one-man show and hence less formally conducted than a large company, I am surprised by neither the informality nor the nature of the entries, especially when the only attack on them is that they are unvouched. There is not a word to show even that they were unnecessary, excepting possibly "entertainment," and this leaves the challenge of them at the mercy of defendant's explanation, which appeals to me as entirely reasonable.

As for the building fund, it was more of a hope chest than a firm addition to capital. The contributions to it were small, and with building costs what they have been since the war, the fund looks like a savings account that is subject to invasion when emergencies arise. I regard the withdrawals as having been required for working capital.

I accordingly accept defendant's version on these two points.

There remains only the question of good will. The temptation is to regard this small company, with only three stockholders and 48 shares among them, as virtually a partnership and to apply the applicable rules for paying out a partner. These would exclude good will: Underdown, Executrix, v. Underdown, 279 Pa. 482 (1924). However, Lindsay's Estate, 210 Pa. 224 (1904), involves a corporation, larger than Artcraft, but still small and with stock closely held. That case is so near on the facts that its rule requiring good will should apply.

No evidence of good will was offered by plaintiff until I suggested it. This weakens the force of his ensuing evidence, per his accountant, of $27,800, which in itself strikes me as a colossal figure. It is based on only the profitable years, including the two abnormal ones. But if we take all the years of which we have evidence—even if this does not achieve a wholly accurate result—we get a 12½-year stretch, including seven years of no earnings and the two large ones. The average earnings for this period are $3,939, and subtracting the accountant's figure of 10 percent on capital employed, or $3,140, the difference is $799, which, capitalized at 20 percent, results in a good will figure of $3,995.

Defendant's president said that in November 1949 he would sell the business for $65,000 to $75,000. Perhaps his low figure was not far wrong, as it is only $3,963.65 over the agreed book value of $61,036.35, and compares very closely with the good will just calculated. It is a low figure for good will as such, and does not quite reflect the fact that the company's earnings had improved substantially during the five years preceding the effective date and that the good will must have been greater at that time than the average

suggests. I shall therefore take as good will one half the difference between $61,036.35 and $75,000. This figure is $6,981.82.

On the general value of the shares, the claims and admissions by both parties are various and in turn differ greatly from the testimony of their witnesses. Plaintiff's original claim was for $3,663.41 per share; after his evidence was in it was for $1,976 per share; with his accountant's good will added it became $2,555 per share.

On the other hand, defendant's answer avers that on November 1, 1949, the shares were worth $974.63 and the book value almost exactly 48 times that, or $46,822.11; but the parties have now agreed on a book value of $61,036.35, and Mr. De Ancona said that he offered plaintiff $8,000 for the 11 shares. Mr. Sayers gave the "fair value" of the stock as $800 per share but said he personally wouldn't pay so much for it. One witness said that the stock should not sell for more than half the book value and probably less. Other witnesses reflected the idea that after taking quick assets, plant and equipment should be discounted by 75 percent to 80 percent: a rough calculation on this basis shows a per share value of about $845. These witnesses thought the business had no good will because it depends on the activity and ability of one man, but they indicated that his staying on would affect the value of the stock. In the instant transaction there was no question of Mr. De Ancona's leaving.

To this wilderness of clear ideas I shall add three of my own. One is that the plant and equipment, including real estate, appears in the agreed balance sheet as the average of two appraisals, one made by each party; they must therefore represent very nearly actual value. The second idea is that the basis of value here is that Mr. De Ancona is, in effect, buying some more of his own business; it should therefore be more valuable to

him than to others, and he let that slip when he said what he'd take for the business. Mr. Sayers spoke as a broker talking about market value, which is not the main consideration. Mr. De Ancona's competitors spoke as competitors might about buying a dead cat, and liquidation value is not the whole measure. Certainly "fair value" in the circumstances of this case lies closer to actual value than to other standards applicable to situations not involved here.

The third idea is that while actual value plus good will is nearest the mark of fair value of the stock of a going business, there are other intangibles to be considered and given some attention. These are: the lack of any market for the stock; the company's uneven record of earnings; the dependence of the business on one or two men; the need to discount the appraised value of plant and equipment to arrive at actual value; the fact that a minority block of stock is involved.

Since there is no mathematical formula to be applied, fair value must be where my mind rests easy among the various factors involved. Under all the circumstances, I feel that the good will neutralizes the amount by which the balance sheet should be discounted to meet the intangibles. Hence, I adopt the figure of $61,-036.35, as the fair value of the stock. This results in a value of $1,271.59 per share, which, multiplied by 11, results in my finding.

The court accordingly finds in favor of plaintiff in the sum of $13,987.49. Interest cannot be allowed on the whole claim, since the contract provides that the fair value is "to be paid over a period of five years". This must mean that the amount is to be paid in five equal yearly installments from September 28, 1950, the date of demand. Only one of these installments—the first—is in arrears and I cannot assume that the others will not be paid in time. Interest is therefore allowed only on $2,797.50 in the sum of $188.85.

The total finding is therefore $14,176.34.